(60 South. 669.)

No. 19,103.

### VILLERET v. JEFFER.

(Dec. 16, 1912.   Rehearing Denied Jan. 20, 1913.)

*(Syllabus by Editorial Staff.)*

1. LIBEL AND SLANDER (§ 56*)—SLANDER—DEFENSES.

Only the truth will justify a slanderous charge of theft, so that it is immaterial that defendant honestly believed on probable cause that his charge was true.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 153–156; Dec. Dig. § 56.*]

2. APPEAL AND ERROR (§ 194*)—PRESENTATION BELOW—ISSUES.

Where plaintiff did not raise below the sufficiency of the answer in slander as alleging the truth of the matter complained of, its sufficiency cannot be attacked on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1241–1246; Dec. Dig. § 194.*]

3. LIBEL AND SLANDER (§ 112*) — ACTION — SUFFICIENCY OF EVIDENCE.

Evidence in slander by charging the theft of a cow *held* not to sustain a verdict for plaintiff rendered on the theory that he did not steal the cow.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 325–341; Dec. Dig. § 112.*]

Appeal from Twenty-First Judicial District Court, Parish of Iberville; C. K. Schwing, Judge.

Action by A. W. Villeret against Israel Jeffer. Judgment for plaintiff, and defendant appeals. Judgment set aside, and suit dismissed.

Borron & Wilbert, of Plaquemine, for appellant. J. H. Pugh, of Plaquemine, and Walter Lemann, of Donaldsonville, for appellee.

PROVOSTY, J. This is an action for slander. The defendant is alleged to have told several persons that plaintiff had stolen his cow, and that he would prosecute him criminally.

[1] Defendant urges that he honestly believed the assertion to be true, and had probable cause for so believing. This, however, is not a good defense to a suit of this kind. Nothing short of the truth itself will suffice. Even the truth is no defense in some states; the reason being that the law frowns upon scandal, and will not excuse the defamation of a person unless the occasion justifies, or, in legal parlance, is privileged. If Lester v. Corley, 45 La. Ann. 1006, 13 South. 467, contained anything contrary to this, it would be in opposition to hornbook law, and would have to be overruled; but it does not. While not very distinct in its doctrine, it will be found to rest, in final analysis, upon the privileged nature of the communication there in question. The neighbors and friends of the father of the plaintiff had gathered together at his request for consultation, and the objectionable remarks were made by way of counsel and advice.

[2] The next question is whether the answer of defendant contains a plea of the truth in justification. The answer, after the general denial, and after an admission that the words complained of were spoken, avers that they were spoken without malice, in the

honest and firm belief, founded on good and sufficient reason, of their being true, and that defendant continues in that belief. The averment of a firm belief founded upon good and sufficient reasons that a certain fact exists may not be exactly an averment of the existence of that fact, but it comes very near it; and the point of whether it is or not is immaterial in the present case, for plaintiff did not raise in the lower court the question of the sufficiency of the averments of the answer for raising the issue of the truth of the matter complained of, but allowed the case to be tried without objection upon that issue, and has raised that question for the first time on the appeal in argument: entirely too late, since the case, having been tried upon that issue without objection, should be decided upon it.

[3] There can be no controverting that Jeffer's milch cow, resembling the one in question in color, size and conformation, like it a good milker, and having six teats, and branded on the left hip, failed to show up one morning at defendant's gate as was her wont, her calf bleating in vain, and was never afterwards seen or heard of, unless in the form of the cow in question. A person who knew her well came and told Jeffer that she was in plaintiff's pasture. Jeffer went there with two men who knew his cow well, and they indentified the cow. Jeffer testifies that Villeret refused to give any account of how he had acquired the cow. Villeret testifies that he told defendant he had bought her and had a receipt, but that he refused to tell Jeffer from whom he had made the purchase; it being none of Jeffer's business. Jeffer then instituted a suit before the justice of the peace court. In that suit Villeret testified that he had bought the cow on the 13th of June, 1909, from a man named Hogan; that Hogan and another man were passing down the public road with a drove of cattle, and had stopped under some shade trees on the side of the road in front of his (witness') house, to rest their cattle; the day being very warm. In corroboration of his testimony, he produced a receipt which he said Hogan had given him. On that trial a man named Frank Poche testified that he had passed by and seen plaintiff and these two men talking on that occasion. On that trial some witnesses testified that the brand was Jeffer's, while others testified that it was not. The justice of the peace caused the cow to be brought up, and, after having examined the brand, and heard Jeffer's witnesses, gave judgment in his favor. Villeret appealed to the district court, and the decision was reversed. On this second trial, Villeret produced the same witness Poche, and another witness named Walker. Poche testified as before. Walker testified that he saw the cattle under the shade trees, and saw Villeret looking at the cow in question. Again, on this second trial, witnesses testified pro and con as to the brand being Jeffer's. The judge caused the cow to be brought up and the hair to be clipped; and, after having examined the brand, pronounced it not to be Jeffer's, and gave judgment in favor of Villeret. Villeret sold the cow to a butcher, to be slaughtered and some time afterwards brought the present suit. The present case was tried by a jury, and again decided in favor of Villeret. The trial judge, in refusing a new trial, said:

"While I cannot approve of the verdict of the jury in this case, to grant a new trial will result only in increasing costs, for eventually the matter will have to find its way to the appellate court."

The town of Whitecastle begins at the upper boundary line of the Soniat plantation. Both the town and the plantation front on the public road, which runs along the levee along the Mississippi river. Jeffer was a merchant and lived in the town, about two and a half squares from the plantation and a square and a half from the river. Villeret was the field watchman of the plantation to

protect the crops against cattle, and lived in the back part of a grove some 10 acres in area on the front of the plantation at its upper boundary; or, in other words, just below the lower limit of the town. On the 13th of June, 1909, the date of the receipt produced by Villeret as having been given him by Hogan for the cow, a drove of cattle in charge of two men did pass through Whitecastle, going down the river towards Donaldsonville, and this drove did stop under the trees on the side of the public road in front of the Soniat plantation to rest, the day being very warm. The two men in charge of this drove were named Vine and Hearst. They lived in the parish of East Feliciana, and had come from there with this drove. Neither of them testified on the first two trials, but Vine did on the trial of the present case. He remembered very well resting his cattle under the shade trees in question, and also that he counted them on leaving there, and that none was missing, but that when within five miles of Donaldsonville he noticed that a certain red cow, the fattest of his drove, was missing; that he came back as far as Whitecastle to look and inquire for her, and failed to find her; that this cow had no brand upon her. It was in October that Jeffer's cow disappeared. His counsel suggest that his cow may have got into the Soniat field, and that Villeret, who, doubtless, had heard of a red cow having been lost from the drove which had passed down the road on the 13th of June, may have concluded that this was the cow, and that he could safely keep her. Be that as it may, we have concluded that there are too many suspicious circumstances attending plaintiff's case for us to give him judgment. There is no room for doubt that the drove that Villeret intended to have reference to in accounting for his acquisition of this cow was the drove of the 13th of June. The date, the time of day, the circumstance of there being

two men, correspond. And several cattlemen and butchers, part of whose business it would be to know of the drove of cattle passing, testify that they remember very well this drove of the 13th of June, and do not know of any other having passed that season. Villeret testified that he had heard that Jeffer had traded a horse for some of the cattle of this drove, and that a cattleman named Wunstel and the witness Jake Walker had bought some of the cattle. Now, these transactions, which Villeret had thus heard of, did in fact take place. By all these circumstances, and others needless to be mentioned, this drove of cattle of the 13th of June is identified beyond a doubt with the drove out of which Villeret says he bought this cow from Hogan. Indeed, so conclusively is the identity of the two droves established that his counsel have no option but to adopt the theory that the drove was the same drove, and that the cow was sold to him by Hearst, who assumed the name of Hogan. Now, as this drove of cattle belonged to Mr. Vine and Mr. Bennett, and Hearst was a mere employé, Hearst could have sold this cow only by stealing her for that purpose, and doing it in the presence of Vine, for the second of the two men, who Villeret says were in charge of the cattle, could have been no other than Vine. How utterly improbable such a thing is can hardly need to be pointed out. Besides, the red cow which Vine lost was not branded, and the Hogan receipt calls for a branded animal. Vine testifies that the writing of this receipt is not at all that of Hearst. He says that Hearst was a dark complexioned man, like a Spaniard; whereas Villeret says that Hogan was a light complexioned man, a blonde. It is simply impossible that Hearst should have been Hogan, unless Vine, an entirely disinterested witness, a stranger to the parties, a man we gather of some standing, whose testimony

carries conviction, simply perjured himself. On the trial Villeret was made to write, under dictation, a receipt containing nearly all the words written in the first receipt. The two handwritings look suspiciously alike, and Mr. E. A. O'Sullivan, the expert in handwriting, testifies that the two documents were written by the same hand, and points out a number of very striking peculiarities going to show that they were. When Villeret was asked by Jeffer from whom he had bought the cow, he refused to answer. When the justice of the peace requested him to bring the cow for examination, he would not do so, and the cow had to be sent for. When the cow was driven to Plaquemine for inspection during the trial on the appeal, the brand had been so whipped as to be all waled or welted and bleeding, or more or less disfigured. Finally, before bringing this suit, Villeret sold the cow for $15 to a butcher to be butchered, although she was a valuable milch cow. This, whether so intended or not, was a suppression of evidence. Jeffer's brand was an "E" and a "J." The brand on the cow was an "E" and a "J," only these letters were connected; but the evidence establishes that this connection might have been made later either by accident or by design. The sudden disappearance of Jeffer's milch cow, accountable only on the theory of her having been stolen; the positiveness of the witnesses who identify her, all of whom knew her well, and one of whom had milked her for months; the similarity of the brand; the peculiarity of the freakish number of teats; the refusal of Villeret at first to give the name of the person from whom he said he had bought the cow; his reluctance to produce the cow; his having sold her at a vile price before the institution of this suit; the cruel manner in which the brand on the cow had been lashed and disfigured while she was being driven to Plaquemine for the purpose of having this brand examined by the court; the lameness of the account given by Villeret of how he acquired the cow; the peculiar similarity between the handwritings of the two receipts—all these circumstances lead us to disbelieve Villeret's story, or at least to doubt it so seriously that we could not bring ourselves to approve the judgment in his favor.

His two witnesses, Poche and Walker, are shown on cross-examination to have testified to a great deal more on the trial of the present case than on the previous trials. On the previous trials Poche had seen Villeret talking to the two men. On the last trial he had heard every word of the bargain, and had seen Villeret and Hogan go to Villeret's house for drawing up the receipt. On the previous trial Walker had seen Villeret and the two men talking together. On the last trial he had seen that the cow had prematurely dropped her calf. They account for this additional knowledge by saying that on the previous trials they were not questioned as to these additional circumstances. In a case as closely contested as cow cases generally are, and as the present one in particular was, it is not probable that the star witness of one of the parties would have been suffered to leave the stand without all the important facts within his knowledge having been brought out.

The judgment appealed from is set aside, and plaintiff's suit is dismissed, at his cost in both courts.